**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CHRISTINE L. BENSE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:12CV39 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Christine L. Bense for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 12).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 15).  Plaintiff has filed a Reply.  (Doc. No. 16).

**Procedural History**

On November 10, 2008, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on October 27, 2006.[1]  (Tr. 133-42).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

---

[1]Plaintiff subsequently amended her alleged onset of disability date to August 29, 2008. (Tr. 15).

written opinion by an Administrative Law Judge (ALJ), dated July 26, 2010.  (Tr. 87-91,12-25).

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on November 25, 2011.  (Tr. 6, 5).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§

404.981, 416.1481.

## Evidence Before the ALJ

A.   **ALJ Hearing**

Plaintiff's administrative hearing was held on February 11, 2010.  (Tr. 32).  Plaintiff was

present and was represented by counsel.  (Id.).  Also present was vocational expert Delores E.

Gonzalez.  (Id.).

The ALJ examined plaintiff, who testified that she was divorced and had two children,

who were aged thirty and twenty-eight.  (Tr. 35).  Plaintiff stated that she had five grandchildren.

(Id.).  Plaintiff testified that she was forty-nine years of age.  (Tr. 36).

Plaintiff stated that she had an eleventh grade education.  (Tr. 37).  Plaintiff testified that

she quit school to get married.  (Id.).

Plaintiff stated that she lived with her ex-husband.  (Id.).  Plaintiff testified that she was

renting a room at her ex-husband's home, and that she paid rent by doing housework, laundry,

and cooking.  (Id.).  Plaintiff stated that she was divorced in June of 2002.  (Id.).  Plaintiff

testified that she initially lived apart from her ex-husband but her husband offered to rent a room

to her when "things started falling apart for [her]."  (Tr. 38).  Plaintiff stated that she had been

living with her ex-husband for five years, and that they were friends at the time of the hearing.

(Id.).

Plaintiff testified that she receives food stamps.  (Id.).  Plaintiff stated that her ex-husband is sixty-eight years of age, and is retired.  (Id.).

Plaintiff testified that she is able to read and perform simple arithmetic.  (Tr. 39).  Plaintiff stated that she is able to write but her writing is illegible because she has "the shakes" a lot.  (Id.).

Plaintiff testified that she began receiving Medicaid benefits in October of 2006.  (Tr. 40).  Plaintiff stated that she filed a workers' compensation claim approximately seven years prior to the hearing due to a broken ankle.  (Id.).  Plaintiff testified that this claim settled.  (Tr. 41).

Plaintiff stated that she last worked in October 2006 as a part assembler for Hughes Industries, Inc.  (Id.).

Plaintiff testified that she worked as a bartender.  (Tr. 42).  Plaintiff stated that she also stocked at this position.  (Tr. 43).

Plaintiff testified that she worked at the counter at a butcher shop.  (Id.).  Plaintiff stated that she also cut some meat at this position.  (Id.).

Plaintiff testified that she worked as a server at a restaurant.  (Tr. 44).  Plaintiff stated that she also did some "utility management" at this position, which involved filling in for managers.  (Id.).  Plaintiff testified that she supervised ten to fifteen employees and had the ability to hire and fire.  (Id.).

Plaintiff stated that she also worked at various other jobs, including other server positions, bartender positions, and a position as a cashier at a liquor store.  (Tr. 45-46).

Plaintiff testified that she was diagnosed as bipolar ten years prior to the hearing.  (Tr. 48).  Plaintiff stated that she has been taking medication for bipolar disorder continuously for ten years.

(Id.).  Plaintiff testified that she sees Dr. Sanjeev Kamat for treatment of her bipolar disorder.
(Id.).  Plaintiff stated that she has been seeing Dr. Kamat for two to three years.  (Id.).

Plaintiff testified that she has also been diagnosed with anxiety disorder, and that she has experienced symptoms of anxiety for ten years.  (Id.).

Plaintiff stated that she had been really hyper and unable to sleep the past month.  (Id.).
Plaintiff testified that she had "bad dreams," and heard voices.  (Id.).  Plaintiff stated that her doctor planned to change her medications.  (Tr. 49).

Plaintiff testified that she also takes medication for a breathing problem, and that the medication controls this impairment.  (Id.).

Plaintiff stated that she takes three different medications for her bipolar disorder and anxiety.  (Id.).  Plaintiff testified that she also takes a sleep medication, which helps with her difficulty sleeping.  (Tr. 50).

Plaintiff stated that she experiences severe depression as a result of the bipolar disorder.
(Id.).  Plaintiff testified that she is emotional and has crying spells.  (Tr. 51).  Plaintiff stated that she has been experiencing these symptoms for ten years, although she was able to work at times during this period.  (Id.).

Plaintiff testified that she was fired from her last position due to her impairments.  (Id.).
Plaintiff explained that she "had a breakdown" and was hospitalized.  (Id.).  Plaintiff testified that she has been hospitalized several times.  (Id.).  Plaintiff stated that her longest hospitalization was for approximately two weeks.  (Tr. 52).

Plaintiff testified that she goes grocery shopping with her ex-husband.  (Id.).  Plaintiff stated that she occasionally goes out to eat.  (Id.).

- 4 -

Plaintiff testified that her children live in St. Joseph, Missouri; and Macon, Missouri.  (Tr. 53).  Plaintiff stated that she took a trip to visit her children the week of Christmas.  (Id.).  Plaintiff testified that her ex-husband drove.  (Id.).  Plaintiff stated that she does not own a vehicle.  (Id.).  Plaintiff testified that her children took her out to eat when they were visiting.  (Tr. 54).

Plaintiff stated that she does not attend Church, participate in any other social activities, or visit with friends.  (Id.).

Plaintiff testified that she has had problems with substance abuse in the past.  (Id.).  Plaintiff stated that the last time she used illegal drugs or alcohol was five years prior to the hearing.  (Tr. 55).  The ALJ noted that Dr. Kamat's records indicate that plaintiff was drinking excessive amounts of alcohol at the end of 2006.  (Id.).  Plaintiff testified that she did drink excessively for a one-month period, which resulted in a hospitalization.  (Tr. 56).  Plaintiff stated that she had difficulty with her memory.  (Id.).

Plaintiff testified that she made an attempt on her life at the end of 2006.  (Id.).  Plaintiff stated that she was hospitalized for two weeks as a result of this incident.  (Tr. 57).  Plaintiff testified that since 2006, she has only had "maybe a glass of wine."  (Id.).  Plaintiff stated that she had not done any illegal drugs since that time.  (Id.).

Plaintiff testified that she has been taking her medications correctly.  (Id.).  Plaintiff stated that her ex-husband reminds her to take her medications every day.  (Id.).

Plaintiff testified that she smokes one package of cigarettes a day.  (Tr. 58).  Plaintiff stated that her doctor has advised her to quit smoking because she uses an inhaler.  (Id.).

Plaintiff described her condition as "up and down."  (Id.).  Plaintiff testified that her doctor

- 5 -

regularly changes her medication based on how she is doing to achieve the best result.  (Tr. 59).

Plaintiff stated that she has a driver's license but she does not drive due to the medications she takes.  (Tr. 59).  Plaintiff testified that she performs housework and cooks.  (Id.).  Plaintiff stated that she cooks full meals such as spaghetti, fried chicken and mashed potatoes, and "just about anything."  (Id.).  Plaintiff testified that she washes dishes by hand, does laundry, vacuums, and shops for groceries.  (Tr. 60).  Plaintiff stated that she has not shopped for clothes recently because she cannot afford to buy new clothes.  (Tr. 61).

Plaintiff's attorney examined plaintiff, who testified that she did not know why she shakes all the time.  (Id.).  Plaintiff testified that she is a nervous person, and that everything makes her nervous.  (Id.).

Plaintiff stated that, when she goes grocery shopping, she cannot be in the aisle with too many people or she has a panic attack.  (Tr. 62).  Plaintiff testified that, when she experiences a panic attack, she is unable to breathe and must get away from the situation.  (Id.).  Plaintiff stated that she occasionally has panic attacks for no reason when she is at home.  (Id.).

Plaintiff testified that she does housework for "a couple of hours," after which she feels "drained."  (Id.).  Plaintiff stated that she spends the rest of the day watching television.  (Id.).  Plaintiff testified that she does not feel comfortable going out with a lot of people because she experiences panic attacks.  (Tr. 63).

Plaintiff stated that her concentration is "really bad."  (Id.).  Plaintiff testified that her memory is "bad."  (Id.).  Plaintiff stated that her long-term memory is worse than her short-term memory.  (Id.).

Plaintiff testified that the month prior to the hearing she cried one to two times daily.

(Id.).  Plaintiff stated that the frequency of her crying spells varies depending on her medication changes.  (Id.).  Plaintiff testified that Dr. Kamat constantly adjusts her medications and she has to wait until a new medication "kicks in" to determine whether it will improve or worsen her condition.  (Id.).

The ALJ next examined the vocational expert, Delores E. Gonzalez, who described plaintiff's vocational history as follows: assembly line work (light, semi-skilled); bartender (light, semi-skilled); counter worker (light, semi-skilled); waitress (light, semi-skilled); utility manager (light, semi-skilled); and retail cashier/stocker (heavy, semi-skilled).  (Tr. 66).  Ms. Gonzalez testified that plaintiff had customer service and managerial skills that were transferable to other jobs.  (Id.).

The ALJ asked Ms. Gonzalez to assume a hypothetical claimant with plaintiff's background and the following limitations: no exertional limitations; able to understand, remember, and carry out at least simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work related decisions; adapt to routine, simple work changes; perform repetitive work according to set procedures, sequence and pace; and can perform some complex tasks.  (Tr. 66-67).  Ms. Gonzalez testified that the individual could perform plaintiff's past assembly line position, bartender position, counter work position, waitress position, and cashier/stocker position.  (Tr. 67).

The ALJ next asked Ms. Gonzalez to assume the following mental limitations: understand, remember, carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for two-hour segments over an eight-hour period; demonstrate adequate judgment to make simple work-related decisions; respond appropriately to supervisors and co-workers in a

task-oriented setting where contact with other is casual and infrequent; and perform repetitive

work according to set procedures, sequence, and pace.  (Id.).  Ms. Gonzalez testified that the

individual would be unable to perform any of plaintiff's past work because none of plaintiff's past

positions were unskilled.  (Id.).  Ms. Gonzalez stated that the individual would be able to perform

other jobs, such as sticker, which is sedentary and unskilled (280,160 positions nationally, 6,320

in Missouri); suture winder, which is sedentary and unskilled (499,870 nationally, 11,330 in

Missouri); and bench assembler, which is light and unskilled (288,470 positions nationally, 6500 in

Missouri).  (Tr. 67-68).  Ms. Gonzalez testified that a suture winder winds single or multiple

lengths of surgical catgut onto fiber suture reels and performs this job independently without

talking to other people.  (Tr. 68).

The ALJ then asked Ms. Gonzalez to assume the following limitations: able to understand,

remember, and carry out at least simple instructions and non-detailed tasks; unable to maintain

concentration and attention for two hour segments over eight-hour periods; could have up to two

crying spells per day that could last up to thirty minutes, which would take the individual off task

and could impact other workers; and could respond appropriately to supervisors, and co-workers

in a task-oriented setting where contact with others is casual and infrequent.  (Id.).  Ms. Gonzalez

testified that these limitations would preclude competitive employment due to the disruptive

nature.  (Tr. 69).

The ALJ indicated that he would order a psychological evaluation.  (Tr. 69).

**B.**     **Relevant Medical Records**

The record reveals that plaintiff saw psychiatrist Sanjeev Kamat, M.D. on approximately a

monthly basis beginning in December 2006.  (Tr. 275).  On December 27, 2006, plaintiff

presented with complaints of depression and anxiety.  (Id.).  Dr. Kamat noted that plaintiff had a

past psychiatric history of bipolar affective disorder ("BAD") type I.[2]  (Id.).  Plaintiff reported that

she had lost her job and had been out of medication for one month.  (Id.).  Plaintiff reported

symptoms of depression including decreased interest, feeling tired, poor concentration, poor

appetite, and difficulty sleeping at night.  (Id.).  Plaintiff indicated that her last manic episode

occurred one to one-and-a-half years prior.  (Id.).  Plaintiff reported that she had been drinking

beer and hard liquor the past few days.  (Tr. 276).  Upon mental status examination, Dr. Kamat

noted that plaintiff shook, her mood was sad, her affect was restricted, she was anxious, her

thought process was logical, her insight and judgment were fair, and she had no homicidal or

suicidal ideation.  (Tr. 277-78).  Dr. Kamat diagnosed plaintiff with BAD type I, current

depressive episode; generalized anxiety disorder; and a GAF score of 55-65.[3]  (Tr. 278).  Dr.

Kamat prescribed Seroquel,[4] Clonazepam,[5] and Cymbalta.[6]  (Id.).

On January 23, 2007, plaintiff reported that she felt depressed and that she had not been

taking her medication for one week as it had been stolen.  (Tr. 280).  Dr. Kamat restarted

---

[2]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes.  Stedman's Medical Dictionary, 568 (28th Ed. 2006).

[3]A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[4]Seroquel is an anti-psychotic drug indicated for the treatment of bipolar disorder and schizophrenia.  See WebMD, http://www.webmd.com/drugs (last visited February 27, 2013).

[5]Clonazepam is indicated for the treatment of panic disorder.  See Physician's Desk Reference ("PDR"), 2639 (63rd Ed. 2009).

[6]Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety disorder.  See PDR at 1801.

plaintiff's medications.  (Id.).  On January 31, 2007, plaintiff called to report that she was still feeling sad and anxious despite taking her medications for one week.  (Tr. 281).  Dr. Kamat increased plaintiff's Seroquel.  (Id.).  On February 20, 2007, plaintiff reported that she was admitted earlier that month at De Paul Hospital for depression and that she still feels sad at times and has decreased energy and crying spells.  (Id.).  Dr. Kamat increased plaintiff's Seroquel and Cymbalta.  (Id.).  On March 6, 2007, plaintiff reported feeling depressed and sad, although she denied any homicidal or suicidal ideations.  (Tr. 282).  Dr. Kamat discontinued the Lamictal[7] and started her on Depakote.[8]  (Id.).  On March 21, 2007, plaintiff's husband called to report that plaintiff was not doing well and still felt anxious and depressed.  (Tr. 283).  Dr. Kamat recommended that plaintiff be admitted.  (Id.).  On April 4, 2007, plaintiff reported that she was taking her medications from her hospital discharge and was doing very well.  (Tr. 284).  Plaintiff denied feeling sad, depressed, or anxious, and denied any side effects from her medications.  (Id.).  Dr. Kamat's assessment was BAD type I, currently in remission.  (Id.).  He continued plaintiff's medications.  (Id.).  On May 2, 2007, plaintiff reported some difficulty sleeping at night, but otherwise felt well and denied feeling sad, depressed, or irritable.  (Tr. 285).  On May 30, 2007, plaintiff complained of depression, decreased energy, and trouble concentrating.  (Tr. 286).  Dr. Kamat's assessment was BAD type I, current depressed episode.  (Id.).  He increased plaintiff's dosage of Depakote.  (Id.).  On July 3, 2007, plaintiff reported feeling anxious and indicated that she was dealing with her husband's multiple medical problems.  (Tr. 287).  Dr. Kamat prescribed

---

[7]Lamictal is indicated for the treatment of bipolar disorder.  See PDR at 1491.

[8]Depakote is indicated for the treatment of mixed episodes associated with bipolar disorder, with or without psychotic features.  See PDR at 423.

Ativan.[9]  (Id.).  On July 24, 2007, plaintiff reported feeling depressed and at times somewhat

moody.  (Tr. 288).  Dr. Kamat increased plaintiff's Depakote and Seroquel.  (Id.).  On August 6,

2007, plaintiff reported that she had stopped taking her Seroquel because she believed it caused a

skin rash.  (Tr. 289).  Plaintiff felt depressed and anxious at times.  (Id.).  Dr. Kamat started

plaintiff on Seroquel.  (Id.).  On August 14, 2007, plaintiff reported that she was doing better, and

denied feeling as depressed as before.  (Tr. 290).  On September 18, 2007, plaintiff reported that

she was doing well on her medications and had no side effects.  (Tr. 294).  Plaintiff denied feeling

depressed, irritable, or hyper.  (Id.).  On October 30, 2007, plaintiff reported feeling depressed at

times and had problems with decreased concentration and irritability.  (Tr. 295).  Dr. Kamat

increased plaintiff's Seroquel.  (Id.).  On November 16, 2007, plaintiff reported that she was

crying all the time, has not been sleeping well, had poor concentration and lots of worrying

thoughts, and low energy levels.  (Tr. 296).  Plaintiff's dosage of Seroquel was increased.  (Id.).

On November 30, 2007, plaintiff reported that she still felt depressed and still had some crying

spells and anxiety at times.  (Tr. 297).  Dr. Kamat increased plaintiff's Seroquel and Trazodone[10]

and decreased plaintiff's Wellbutrin.[11]  (Id.).  On December 18, 2007, plaintiff reported that she

still felt less depressed but still felt unenergetic.  (Tr. 298).  Dr. Kamat increased plaintiff's dosage

of Seroquel.  (Id.).  On January 8, 2008, plaintiff reported that she felt very anxious at times,

---

[9]Ativan is indicated for the treatment of anxiety.  See WebMD,
http://www.webmd.com/drugs (last visited February 27, 2013).

[10]Trazodone is an antidepressant indicated for the treatment of depression and other mood disorders.  See WebMD, http://www.webmd.com/drugs (last visited February 27, 2013).

[11]Wellbutrin is an antidepressant indicated for the treatment of major depressive disorder. See PDR at 1649.

hears voices, and experiences paranoia.  (Tr. 300).  Dr. Kamat recommended that plaintiff be
admitted at St. Alexius Hospital and plaintiff agreed to go to the emergency room.  (Id.).

Plaintiff was hospitalized at St. Alexius Hospital from January 9, 2008, through January
15, 2008, for management and evaluation of depressive symptoms and anxiety symptoms.  (Tr.
244, 248).  Upon admission, plaintiff reported that her depression had worsened the previous one
to two weeks, and she continued to feel sad and depressed, had decreased interest, trouble
sleeping at night, felt very anxious, and worries a lot.  (Tr. 248).  Plaintiff also reported occasional
paranoid thoughts and hearing voices at times.  (Id.).  Dr. Kamat noted that plaintiff had been
admitted in March of 2007, and in 2006.  (Id.).  Upon mental status exam, plaintiff's affect was
constricted to blunted in range, her thought process was logical, plaintiff exhibited paranoia and
ideas of reference, plaintiff had auditory hallucinations but denied any visual hallucinations, her
memory was fair, and her insight and judgment were limited.  (Tr. 249).  Dr. Kamat diagnosed
plaintiff with BAD type I, current depressive episode with psychosis; and generalized anxiety
disorder; and assessed a GAF score of 15-20.[12]  (Id.).  Plaintiff was kept on suicidal precautions,
and was treated with medication, including Seroquel and Depakote.  (Tr. 250).  Plaintiff's
discharge diagnoses were BAD type I, current depressive episode with psychosis; and a GAF
score of 70.[13]  (Tr. 245).

---

[12]A GAF score of 11 to 20 denotes "[s]ome danger of hurting self or others (e.g., suicide
attempts without clear expectation of death; frequently violent; manic excitement) OR
occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment
in communication (e.g., largely incoherent or mute)."  DSM-IV at 32.

[13]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and
mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional

- 12 -

On January 28, 2008, plaintiff reported that she was doing well on her current medications and had no side-effects. (Tr. 299). Plaintiff denied feeling sad, hyper, or irritable. (Id.). Dr. Kamat's assessment was BAD type I, and anxiety disorder not otherwise specified. (Id.). On February 25, 2008, plaintiff reported difficulty sleeping well at night but denied hearing voices, experiencing paranoia, or feeling depressed, anxious, or irritable. (Tr. 291). On March 25, 2008, plaintiff reported that she was doing well on her current medication and denied feeling sad, depressed, hyper, irritable, or paranoid. (Tr. 292). On May 20, 2008, plaintiff reported feeling depressed and sad again the past few weeks. (Tr. 293). Plaintiff's dosages of Seroquel and Trazodone were increased. (Id.). On June 17, 2008, plaintiff reported feeling hyper and irritable at times and experienced some racing thoughts. (Tr. 301). Dr. Kamat's assessment was BAD type I, current hypomanic episode. (Id.). Dr. Kamat adjusted plaintiff's medications. (Id.). On July 16, 2008, plaintiff reported that she felt about the same. (Tr. 302). On August 12, 2008, plaintiff reported some anxiety and trouble sleeping at night, but indicated that her depression had decreased. (Tr. 303). Plaintiff's medications were adjusted. (Id.). On September 9, 2008, plaintiff reported that she was anxious and had difficulty staying asleep. (Tr. 304). Dr. Kamat started plaintiff on Lithium.[14] (Id.). On October 7, 2008, plaintiff reported feeling stress due to her husband's hospitalization. (Tr. 305). Dr. Kamat increased her dosage of Lithium. (Id.). On October 20, 2008, plaintiff reported problems with occasional confusion and forgetfulness. (Tr. 306). Plaintiff's dosage of Lithium was decreased. (Id.). On November 4, 2008, plaintiff

truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

[14]Lithium is indicated for the treatment of bipolar disorder. See WebMD, http://www.webmd.com/drugs (last visited February 27, 2013).

reported that her mood was okay, although she still felt anxious.  (Tr. 307).  Plaintiff's dosage of

Lithium was decreased.  (Id.).  On December 3, 2008, plaintiff reported that she felt much better.

(Tr. 308).

Kyle DeVore, Ph.D., a state agency psychologist, completed a Psychiatric Review

Technique on January 20, 2009.  (Tr. 309-19).  Dr. DeVore expressed the opinion that plaintiff's

bipolar affective disorder resulted in no difficulties in maintaining social functioning; mild

limitation in plaintiff's activities of daily living; moderate difficulties in maintaining concentration,

persistence, or pace; and one or two episodes of decompensation.  (Tr. 317).  Dr. DeVore stated

that plaintiff appeared to be very susceptible to stress, although she was capable of performing

simple work tasks.  (Tr. 319).  Dr. DeVore also completed a Mental Residual Functional Capacity

Assessment, in which he expressed the opinion that plaintiff was moderately limited in her ability

to understand and remember detailed instructions; carry out detailed instructions; maintain

attention and concentration for extended periods; accept instructions and respond appropriately to

criticism from supervisors; and respond appropriately to changes in the work setting.  (Tr. 320-

21).

Dr. Kamat completed a Mental Medical Source Statement on February 24, 2009, in which

he expressed the opinion that plaintiff had marked limitations in her ability to interact with

strangers or the general public, maintain attention and concentration for extended periods, and

respond to changes in the work setting; moderate limitations in her ability to cope with normal

stress, function independently, behave in an emotionally stable manner, relate to family and peers,

accept instructions or respond to criticism, ask simple questions or request assistance, maintain

socially acceptable behavior, make simple and rational decisions, perform at a consistent pace

without an unreasonable number and length of breaks, and sustain an ordinary routine without special supervision. (Tr. 333-34). Dr. Kamat found that plaintiff could apply commonsense understanding to carry out simple one or two-step instructions for a total of four hours a day, interact appropriately with co-workers a total of four hours a day, interact appropriately with supervisors a total of six hours a day, and interact appropriately with the general public a total of four hours a day. (Tr. 335). Dr. Kamat indicated that plaintiff's psychological symptoms would cause her to miss work three times a month or more, and would cause her to be late to work or need to leave work early three times a month or more. (Tr. 335-36). Dr. Kamat indicated that plaintiff's limitations have existed at the assessed severity since January 2009. (Tr. 336). Dr. Kamat noted that plaintiff's most recent diagnosis was bipolar affective disorder type I, current depressive episode. (Id.).

On April 21, 2009, plaintiff reported feeling restless and anxious at times. (Tr. 347). Dr. Kamat adjusted plaintiff's medications. (Id.). On May 19, 2009, plaintiff reported that her depression and irritability had decreased, but she still experienced forgetfulness. (Tr. 346).

Plaintiff presented to the emergency room at St. Alexius Hospital on June 2, 2009, reporting that she was feeling very anxious, very depressed, was hearing voices, and was unable to function at home. (Tr. 351, 365). Plaintiff indicated that she had seen Dr. Kamat that morning and he advised her to admit herself. (Id.). Plaintiff was admitted for management and evaluation. (Tr. 351). Upon mental status exam, plaintiff was very distressed and anxious, psychomotor activity was increased, affect was reactive and dysphoric, thought process was logical and sequential, plaintiff denied any paranoid thoughts or delusions, plaintiff denied any auditory or visual hallucinations, plaintiff's insight and judgment were limited, and her memory was normal.

(Tr. 352).  Dr. Kamat diagnosed plaintiff with BAD type I, generalized anxiety disorder, probable akathisia;[15] and a GAF score of 15-20.  (Id.).  Plaintiff was managed with medication, and was discharged on June 9, 2009.  (Tr. 352, 348).

On June 24, 2009, and July 21, 2009, plaintiff reported feeling well on her current medications, and was not depressed, anxious, or paranoid.  (Tr. 337, 338).  On August 18, 2009, plaintiff reported feeling depressed again, having low energy, and feeling tired.  (Tr. 339).  Dr. Kamat increased her dosage of Seroquel.  (Id.).  On September 15, 2009, plaintiff continued to feel depressed and was sleeping poorly.  (Tr. 340).  Plaintiff's dosage of Seroquel was increased. (Id.).  On October 13, 2009, plaintiff reported feeling sad at times, and unenergetic.  (Tr. 341). Plaintiff's medications were adjusted.  (Id.).  On November 10, 2009, plaintiff reported doing okay.  (Tr. 390).

Dr. Kamat completed a second Mental Medical Source Statement on November 10, 2009, in which he expressed the opinion that plaintiff had a marked limitation in her ability to maintain attention and concentration for extended periods; and moderate limitations in her ability to cope with normal stress, function independently, behave in an emotionally stable manner, relate to family and peers, interact with strangers or the general public, accept instructions or respond to criticism, maintain socially acceptable behavior, perform at a consistent pace without an unreasonable number and length of breaks, sustain an ordinary routine without special supervision, and respond to changes in work setting.  (Tr. 342-43).  Dr. Kamat found that plaintiff could carry out simple one or two-step instructions for a total of six hours a day, interact

---

[15]A syndrome characterized by an inability to remain seated, with motor restlessness and a feeling of muscular quivering; may appear as a side effect of antipsychotic medication.  Stedman's at 42.

appropriately with co-workers for a total of four hours a day, interact appropriately with supervisors a total of four hours a day, and interact appropriately with the general public a total of six hours a day.  (Tr. 344).  Dr. Kamat found that plaintiff would miss work and be late for work three times a month or more due to psychological symptoms.  (Tr. 344-45).  Dr. Kamat indicated that plaintiff's limitations had existed at the assessed severity since December 2006.  (Tr. 345).  Plaintiff's most recent diagnoses were bipolar affective disorder type I current depressive episode; and generalized anxiety disorder.  (Id.).

Plaintiff presented to Dr. Kamat on December 15, 2009, at which time she reported feeling well.  (Tr. 389).  Plaintiff was not too sad or depressed, was not anxious, and she slept well at night.  (Id.).  On January 11, 2010, plaintiff reported feeling a little anxious at times, and she had difficulty sleeping.  (Tr. 388).  Plaintiff's medications were adjusted.  (Id.).

Plaintiff was admitted at Forest Park Hospital from February 27, 2010, through March 8, 2010, due to complaints of not sleeping for three nights, anxiety, auditory hallucinations, and suicidal ideations.  (Tr. 404).  Plaintiff indicated that she had been experiencing fleeting suicidal thoughts, and that she tried to harm herself seven to eight years prior and did not want to attempt to end her life again.  (Id.).  Plaintiff reported that she was unable to function during the day due to her tremulousness and increase in anxiety, could not do laundry or any activities of daily living, or take care of her home.  (Id.).  Plaintiff's medications were adjusted.  (Tr. 405).  Plaintiff's discharge diagnoses were BAD, possibly mixed state; anxiety not otherwise specified versus generalized anxiety disorder and alcohol abuse; and a GAF score of 50.[16]  (Tr. 405-06).  Plaintiff's

---

[16]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

- 17 -

discharge medications included Seroquel, Lunesta,[17] Mirtazapine,[18] Trazodone, and Ambien.[19] (Tr. 406).

On April 7, 2010, F. Timothy Leonberger, Ph.D. performed a neuropsychological evaluation. (Tr. 396-402). Plaintiff reported that she was unable to work because she could not concentrate and follow directions, her emotions "were bad," and she shakes. (Tr. 396). Plaintiff stated that she was unable to perform the past three jobs she had. (Id.). Upon mental status exam, plaintiff's thinking was logical and sequential with no evidence of a thought disorder present; her mood appeared depressed and somewhat anxious; her affect was withdrawn, nervous and shy; her attention/concentration was generally adequate for the tasks that were presented to her; and her insight into her current situation appeared fair. (Tr. 398). Dr. Leonberger administered testing, and found that the results were a valid and reliable measure of plaintiff's intellectual and neuropsychological functioning. (Tr. 399). Dr. Leonberger, however, indicated that the results of the MMPI-2-RF test were invalid due to plaintiff's over-reporting of symptomatology. (Id.). Dr. Leonberger noted that plaintiff's level of endorsing psychiatric symptoms was higher than even the most disturbed individuals with genuine psychopathology. (Tr. 401). Dr. Leonberger administered the WAIS-III, which revealed a verbal IQ score of 79, performance IQ score of 72, and full scale IQ of 74, which placed plaintiff in the borderline range of intellectual functioning. (Tr. 399). Testing revealed that plaintiff's attention/concentration and

---

[17]Lunesta is indicated for the treatment of insomnia. See PDR at 2995.

[18]Mirtazapine is an antidepressant indicated for the treatment of major depressive disorder. See PDR at 2924.

[19]Ambien is indicated for the treatment of insomnia. See PDR at 2693.

memory were in the borderline to low average range.  (Tr. 401).  Plaintiff's persistence and pace appeared detrimentally affected by her depression.  (Tr. 402).  Dr. Leonberger stated that, while plaintiff has a reasonably clear history of depression, very few symptoms of a manic episode were reported and he was uncertain as to how plaintiff was diagnosed with bipolar disorder.  (Tr. 401). Dr. Leonberger diagnosed plaintiff with major depressive disorder, recurrent, moderate; and a current GAF score of 60, with the highest GAF score in the past year of 60.  (Id.).  Dr. Leonberger indicated that plaintiff had moderate impairment in her activities of daily living; moderate impairment in social functioning; moderate impairment in concentration, persistence, and pace; and moderate impairment in deterioration or decompensation in work or work-like settings.  (Tr. 401-02).  Dr. Leonberger stated that plaintiff may be capable of returning to work as a cashier or doing light factory work.  (Tr. 402).

Dr. Leonberger completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on May 7, 2010.  (Tr. 393-95).  Dr. Leonberger expressed the opinion that plaintiff had mild limitation in her ability to understand and remember simple instructions; and moderate limitations in her ability to carry out simple instructions, make judgments on simple work-related decisions, understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.  (Tr. 393).  In support of these findings, Dr. Leonberger explained that plaintiff had a borderline IQ level with a reasonably good memory.  (Id.).  Dr. Leonberger found that plaintiff had moderate limitations in her ability to interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to usual work situations and changes in a routine work setting.  (Tr. 394).  In support of these findings, Dr. Leonberger stated that

- 19 -

plaintiff was depressed and socially withdrawn.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.      The claimant has not engaged in substantial gainful activity since August 29, 2008, the amended alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.      The claimant has the following severe impairment: major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can understand, remember, and carry out at least simple instructions and non-detailed tasks.  She can maintain concentration and attention for two hour segments over an eight hour period; demonstrate adequate judgment and make simple work related decisions; respond appropriately to supervisors and co workers in a task oriented setting where contact with others is casual and infrequent; and can perform repetitive work according to set procedure, sequence, or pace.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on February 10, 1961 and was 47 years old, which is defined at a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      The claimant has acquired work skills from past relevant work (20 CFR 404.1568 and 416.968).

- 20 -

10.    Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills form past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a), 404.1568(d), 416.969, 416.969(a), and 416.968(d)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 29, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-25).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits  filed on November 10, 2008, the claimant is not disabled under sections 216(I) and          223(d) of the Social Security Act.

Based on the application for supplemental security income filed on November 10, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 25).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

B.     **The Determination of Disability**

        The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

        The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity"

- 22 -

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the

- 23 -

determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erred in determining plaintiff's RFC.  Specifically, plaintiff first contends that the ALJ failed to perform a proper analysis of the medical opinion evidence. Plaintiff next argues that the ALJ failed to provide a narrative discussion of the rationale for his RFC determination, and that his specific findings are not supported by medical evidence.  The undersigned will discuss plaintiff's claims in turn.

The RFC test is a function-by–function assessment of an individual's ability to do work-related activities based on all the evidence.  <u>Casey v. Astrue</u>, 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217-18 (8th Cir. 2001).  Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record.  <u>Casey</u>, 503 F.3d at 697; <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can understand, remember, and carry out at least simple instructions and non-detailed tasks.  She can maintain concentration and attention for two hour segments over an eight hour period; demonstrate adequate judgment and make simple work related decisions; respond appropriately to supervisors and co workers in a task oriented setting where contact with others is casual and infrequent; and can perform repetitive work according to set procedure, sequence, or pace.

(Tr. 19).

Plaintiff first argues that, in determining plaintiff's RFC, the ALJ erred in discounting the opinion of treating psychiatrist Dr. Kamat.  "It is the ALJ's function to resolve conflicts among the various treating and examining physicians."  <u>Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks and citation omitted).  When considering professionals' opinions, the ALJ must defer to a treating physician's opinions about the nature and severity of a claimant's impairments, "including symptoms, diagnosis, and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions."  <u>Ellis v. Barnhard</u>, 392 F.3d 988, 995

- 25 -

(8th Cir. 2005) (internal citation omitted).  A treating physician's opinion regarding a claimant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.  Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). While a treating physician's opinion is usually entitled to great weight, it does "not automatically control, since the record must be evaluated as a whole." Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord  the opinion, with such factors including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of speciality.  20 C.F.R. § 404.1527(c).

Dr. Kamat completed two Mental Medical Source Statements.  In his first Mental Medical Source Statement, completed on February 24, 2009, Dr. Kamat expressed the opinion that plaintiff had marked limitations in her ability to interact with strangers or the general public, maintain attention and concentration for extended periods, and respond to changes in the work setting; moderate limitations in her ability to cope with normal stress, function independently, behave in an emotionally stable manner, relate to family and peers, accept instructions or respond to criticism, ask simple questions or request assistance, maintain socially acceptable behavior, make simple and rational decisions, perform at a consistent pace without an unreasonable number and length of breaks, and sustain an ordinary routine without special supervision.  (Tr. 333-34).

Dr. Kamat found that plaintiff could apply commonsense understanding to carry out simple one or two-step instructions for a total of four hours a day, interact appropriately with co-workers a total of four hours a day, interact appropriately with supervisors a total of six hours a day, and interact appropriately with the general public a total of four hours a day. (Tr. 335). Dr. Kamat indicated that plaintiff's psychological symptoms would cause her to miss work three times a month or more, and would cause her to be late to work or need to leave work early three times a month or more. (Tr. 335-36). Finally, Dr. Kamat indicated that plaintiff's limitations have existed at the assessed severity since January 2009. (Tr. 336).

On November 10, 2009, Dr. Kamat completed a second Mental Medical Source Statement, in which he found that plaintiff had moderate rather than marked limitations in her ability to interact with strangers or the public, and respond to changes in the work setting; and no limitation rather than a moderate limitation of her ability to ask simple questions or request assistance; and make simple and rational decisions. (Tr. 342-43). In addition, Dr. Kamat found that plaintiff could apply commonsense understanding to carry out simple one or two-step instructions six hours during an eight-hour period rather than four hours, interact appropriately with supervisors for four hours during an eight-hour period rather than six hours, and interact appropriately with the general public for six hours during an eight-hour period rather than four hours. (Tr. 344). Finally, Dr. Kamat indicated that plaintiff's limitations had existed at the assessed severity since December 2006, rather than January 2009. (Tr. 345).

The ALJ stated that he considered both forms completed by Dr. Kamat, and accords "only some weight" to his opinions. (Tr. 22). The ALJ stated that the forms completed by Dr. Kamat are inconsistent with one another, and it seems that Dr. Kamat has relied on the subjective complaints of plaintiff. (Id.).

The undersigned finds that the ALJ erred in evaluating the opinion of Dr. Kamat.  The ALJ accurately pointed out that there were inconsistencies in the two forms completed by Dr. Kamat.  As discussed above, Dr. Kamat found slightly different degrees of limitations and different onset dates in his two forms.  The ALJ concluded that it seemed that Dr. Kamat relied on plaintiff's subjective complaints in determining plaintiff's limitations.  (Tr. 22).  While the variations in the two forms Dr. Kamat completed are unexplained, there is no evidence to support the ALJ's finding that Dr. Kamat's opinions were based on plaintiff's subjective complaints.  In light of this apparent confusion, the ALJ should have sought clarification from Dr. Kamat on this important issue instead of affording his opinion little weight.

Dr. Kamat had been plaintiff's treating psychiatrist since December 2006, and saw plaintiff approximately once monthly for treatment of her mental impairments.  Dr. Kamat continuously prescribed and adjusted psychotropic medications for plaintiff's mental impairments.  Plaintiff's condition and the symptoms she experienced varied significantly during her monthly visits.  The ALJ's summary of the medical evidence does not reflect this great variation.  In fact, the ALJ discussed very few of Dr. Kamat's treatment notes despite the fact that plaintiff had seen Dr. Kamat monthly for a period of approximately three-and-a-half years at the time the ALJ issued his decision.

The ALJ summarized Dr. Kamat's treatment notes from plaintiff's initial visit in December 2006, and summarized plaintiff's hospitalizations in March 2007, January 2008, and June 2009.  (Tr. 21).  In the only other discussion of Dr. Kamat's treatment notes, the ALJ states, "[d]uring follow up treatment the claimant reported that she was not depressed or anxious.  She did not have suicidal thoughts or paranoia and she was sleeping well at nights."  (Tr. 22).  The ALJ is presumably referring to plaintiff's visits in June 2009 and July 2009, at which time plaintiff

reported that she was doing well on her current medications and was not experiencing symptoms. (Tr. 337-38). The ALJ, however, does not mention that on plaintiff's August 2009 visit, she reported feeling depressed again, having low energy, and feeling tired. (Tr. 339). In September 2009, plaintiff continued to feel depressed and was sleeping poorly. (Tr. 340). In October 2009, plaintiff reported feeling sad and unenergetic. (Tr. 341). Dr. Kamat adjusted plaintiff's medications at these visits. (Tr. 339-41). In November 2009, plaintiff reported doing "okay." (Tr. 390). Plaintiff's monthly treatment notes with Dr. Kamat continued to reflect great variation in plaintiff's symptoms in December 2009 and January 2010. (Tr. 388-89). As the ALJ notes, plaintiff was admitted at Forest Park Hospital for approximately nine days in February and March 2010 due to complaints of not sleeping for three nights, anxiety, auditory hallucinations, and suicidal ideations. (Tr. 404).

In discrediting Dr. Kamat's opinion and concluding that it was based on plaintiff's subjective complaints, the ALJ ignored the medical evidence and substituted his own opinion for that of plaintiff's treating psychiatrist. Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990). In doing so, he clearly erred. "Although the mere existence of symptom-free periods may negate a finding a disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim." Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996). "Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." Id.

Here, the ALJ ignored the evidence from plaintiff's treating psychiatrist that plaintiff's mental impairments were cyclical in nature and varied in severity over time. As previously discussed, plaintiff's symptoms varied greatly during her monthly visits with Dr. Kamat. Dr. Kamat regularly adjusted plaintiff's medication regimen based on her symptoms, and his treatment

notes indicate that plaintiff was compliant with her medications.  Despite plaintiff's psychiatric treatment and medication management, she was hospitalized on numerous occasions due to exacerbation of symptoms.  On this record, there is simply no basis for the ALJ to  conclude that Dr. Kamat's opinion was based on plaintiff's subjective complaints.

Plaintiff next argues that the ALJ erred in assigning significant weight to the opinion of a one-time consultative physician, and a non-examining state agency psychologist.  Plaintiff also contends that the ALJ failed to provide a narrative discussion of the rationale for his RFC findings, and that the RFC determination is not supported by the medical evidence.  The undersigned agrees.

In determining plaintiff's RFC, the ALJ discussed the findings of consultative psychologist Dr. Leonberger.  (Tr. 22-23).  The ALJ noted that Dr. Leonberger found that the results of plaintiff's MMPI-2-RF were considered to be invalid due to plaintiff's over reporting of psychological symptoms.  (Tr. 22-23, 399).  Dr. Leonberger diagnosed plaintiff with major depressive disorder, moderate, and assessed a GAF score of 60.  (Tr. 401).  The ALJ pointed out that a GAF score of 60 indicates moderate symptoms or moderate difficulty in occupational functioning.  (Tr. 23).  The ALJ indicated that he was assigning "considerable weight" to Dr. Leonberger's opinion, as it was based on clinical findings and consistent with the medical record as a whole.  (Id.).

The ALJ also considered the opinion of the non-examining state agency psychologist, Dr. DeVore.  Dr. DeVore completed a Psychiatric Review Technique on January 20, 2009, in which he expressed the opinion that plaintiff had no difficulties in maintaining social functioning; mild limitation in activities of daily living; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation.  (Tr. 317).  Dr. DeVore also

completed a Mental Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (Tr. 320-21). The ALJ indicated that he was according "significant weight" to the "state agency findings," as they are consistent with the medical evidence when considered as a whole. (Tr. 23).

"[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (internal quotation marks and citation omitted). The ALJ erred in relying on the opinions of the consulting sources. First, although the ALJ indicates that he was assigning "considerable" and "significant" weight to the opinions of Drs. Leonberger and DeVore, respectively, he does not discuss any of the specific findings of these sources. Second, the ALJ does not incorporate all of the findings of Dr. Leonberger, such as plaintiff's moderate limitations in her ability to carry out simple instructions, and ability to make judgments on simple work-related decisions. (Tr. 393). The ALJ also does not address Dr. Leonberger's finding, based on psychological testing, that plaintiff's IQ placed her in the borderline range of intellectual functioning. (Tr. 399). Third, with regard to Dr. DeVore, it is significant that he rendered his opinion in January 2009, approximately eighteen months prior to the ALJ's decision. Thus, Dr. DeVore did not have the benefit of a significant amount of medical evidence, including both of Dr. Kamat's medical source statements.

Because the ALJ improperly disregarded the opinion of plaintiff's treating psychiatrist and the other medical evidence of plaintiff's impairments, substantial evidence as a whole does not support the ALJ's decision and the matter must be remanded.

### Conclusion

In sum, the ALJ erred in discrediting the opinion of plaintiff's treating psychiatrist, and relying on the opinion of a consultative physician and a non-examining state agency psychologist in determining plaintiff's RFC.  For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to evaluate the opinions of Dr. Kamat under the proper standards, develop any additional facts as needed, assess a residual functional capacity consistent with the medical and other evidence, and obtain vocational expert testimony to determine whether plaintiff is capable of performing work in the national economy with her limitations.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this 19th  day of March, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE